IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTOINETTE MCZEAL | : | CIVIL ACTION |
| | : | NO. 09-2554 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SCHOOL DISTRICT OF | : | |
| PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                           MAY 16, 2011

## I.   INTRODUCTION

Plaintiff Antoinette McZeal ("Plaintiff") brings this employment discrimination action against the School District of Philadelphia ("Defendant"), claiming that Defendant retaliated against her in five different ways. According to Plaintiff, three of the retaliatory acts followed Plaintiff's filing of a sexual harassment claim, while two followed Plaintiff's filing of this lawsuit. In total, Plaintiff asserts eight counts of retaliation—five under Title VII, and three under the Pennsylvania Human Relations Act (the "PHRA").[1] Defendant moves

---

[1] Plaintiff specifically pleads: in Counts One and Six, claims under Title VII and the PHRA respectively for Plaintiff's transfer to a lower pay grade; in Counts Two and Seven, claims under Title VII and the PHRA respectively for Plaintiff's failure

for summary judgment, contending that Plaintiff's retaliation claims are legally insufficient.

For the reasons set forth below, Defendant's motion will be granted.

II.  **BACKGROUND**[2]

On September 5, 2005, Plaintiff brought a sexual harassment lawsuit against Defendant after her supervisor allegedly gave her sexually explicit birthday cards.  (Am. Compl. ¶ 8; McZeal Dep. at 12:12-18, 17:8-16.)[3]  In January 2006, Plaintiff settled the harassment claim with Defendant.  (Am. Compl. ¶ 9; McZeal Dep. at 12:19-24.)  Plaintiff executed a written settlement agreement on January 11, 2006, which Defendant signed on January 20, 2006.  (Am. Compl. ¶ 9.)  In addition to this agreement, the parties had a separate oral agreement whereby

---

to be compensated for overtime performed; in Counts Three and Eight, claims under Title VII and the PHRA respectively for Plaintiff's failure to be promoted; in Count Four, a claim under Title VII for denying Plaintiff keycard access to her office; and in Count Five, a claim under Title VII for not giving Plaintiff enough work.

[2]  In accordance with the applicable standard of review, see infra Part III, the facts set forth in this section view the evidentiary record in the light most favorable to Plaintiff.

[3]  Defendant's exhibits appear unsorted in ECF document number 26.  For ease, citations to Plaintiff's deposition, which appears in that filing, are referred to as "McZeal Dep." Citations to other materials within ECF document number 26 are titled "Def.'s Exs." and followed by the most helpful identifying information available under the circumstances.

2

Plaintiff would be transferred to a new position within Defendant's employ. (Id. ¶¶ 10-11.) While the new role had a lower salary, Plaintiff was to be paid at her previous rate. (Id. ¶ 11-12.)

Indeed, as a January 13, 2006 e-mail Defendant sent Plaintiff's counsel to "memorialize" the parties' understanding stated:

> Ms Mc.Zeal requested a position in Student Placement. As we discussed yesterday, Ms. McZeal will take a position in Student Placement as a Student Placement Support Clerk. She will begin the position on Monday, January 23, 2006. Her salary in that position will be $48,356 (PFT 22). Because the current maximum salary of the Student Placement Support Clerk position is $40,533 (PFT 17), Ms. McZeal's salary of $48,356 will be "red-circled" (frozen) until the ordinary salary for the position reaches her salary via raises and other adjustments.

(Def.'s Exs., Dixon Dep. Ex. 3.) "Red-circling" is a policy provided for in the collective bargaining agreement between Defendant and Plaintiff's union under which "an employee moved to a lower paid classification shall . . . retain his/her former rate . . . until such time as the rate for that new classification reaches his/her red-circled rate after which he/she shall be entitled to such increases as are applicable to the classification into which he/she has moved." (Def.'s Exs., SDP 00203; see Am. Compl. ¶¶ 12-13.) Red-circling occurs automatically in the payroll system. (See McZeal Dep. at 118:7-14; Def.'s Exs., SDP 00001-00008.) Thus, if an employee is red-circled but is supposed to receive approved pay increases,

the payroll staff must enter a manual override.  (Id.)

Despite the abovementioned e-mail sent to Plaintiff's counsel, Plaintiff did not realize that the transfer to the Office of Student Placement would lead her to be red-circled. Instead, she first learned of the pay freeze in April 2007 when she did not receive a pay increase that others in Plaintiff's union received.  (McZeal Dep. at 117:3-118:14.)  Plaintiff complained to her union, but was told "that the policy was standard procedure."  (Am. Compl. ¶ 13.)  Eventually, Plaintiff spoke about the red-circle with Dr. Cassandra Jones, Defendant's Chief Academic Officer, to "see what she could do to help me." (McZeal Dep. at 145:4-5.)  Dr. Jones directed that Plaintiff receive the April 2007 pay increase as well as any future increases.  (Id. at 151:1-14, 152:4-17.)  Plaintiff received a retroactive pay increase as a result, and has since had manual entries made by Defendant's payroll staff to override the red-circle.  (Id. at 152:8-11, 153:16-154:1.)

In her new capacity as a Support Services Clerk, Plaintiff reported to LeTretta Jones who, as Plaintiff's supervisor, had to approve any overtime requests in advance. (See id. at 26:12-15; see also Def.'s Exs., SDP 00064.)  Between the months of October and December 2007, Plaintiff worked thirteen hours of overtime for which she was allegedly not compensated.  (McZeal Dep. at 128:17-21, 130:2-6; Def.'s Exs.,

McZeal Dep. Ex. 5.)  Plaintiff, however, received overtime payments during this period, (see Def.'s Exs., SDP 00004 (itemizing 17.25 hours of overtime payment to be paid to Plaintiff for November 2007)), and was informed that Ms. Jones had concluded that Plaintiff was "paid overtime for all the hours that [she] worked" after "review[ing] the request for overtime documents . . . submitted and compar[ing] them with the TPER/payroll."  (Def.'s Exs., SDP 00043.)

In the meantime, Plaintiff began pursuing a new job with Defendant after learning Defendant's School Safety department was "having problems with that office with the payroll."  (McZeal Dep. at 155:7-9.)  To that end, she introduced herself to Brendan Lee, Defendant's Executive Director of School Safety, and later met with him to discuss the creation of a new "Financial Coordinator" position.  (Def.'s Exs., SDP SJM Ex.; McZeal Dep. at 157:8-14, 176:5-9.)  In connection with this latter meeting, which Plaintiff considered to be an interview, Plaintiff prepared a job description of the proposed position. (McZeal Dep. at 163:18-24.)  Plaintiff recognized, however, that no specific position had been created.  (Id. at 176:12-15.) Ultimately, on March 25, 2008, Lee informed Plaintiff that the position could not be created within the department's budget. (Pl.'s Resp. In Opp., Ex. 8.)  To this day, no such position has been created.  (Def.'s Exs., SDP SJM Ex.)

5

On June 5, 2009, Plaintiff filed this lawsuit. Later that year, between the months of November 2009 and December 2009, Plaintiff's keycard for Defendant's building did not work during after-business hours when Plaintiff arrived to complete pre-approved overtime. (McZeal Dep. at 241:20-242:4.) Building security staff informed Plaintiff that they had received an e-mail from Ms. Jones directing them to let Plaintiff into the office during these hours. (Id. at 243:3-18.) This was necessary because Plaintiff, along with another employee, was not afforded the 24/7 building access that at least one other employee of Defendant had. (Def.'s Exs., SDP 00180.) Plaintiff was always let into the facility during the relevant period, and worked all approved overtime hours. (McZeal Dep. at 245:15-23; Am. Compl. ¶ 46.)

Thereafter, beginning in January 2010 and through February 2010, Plaintiff observed other employees of Defendant, including Ms. Jones, perform work that Plaintiff had ordinarily been assigned. (Am. Compl. ¶ 32; McZeal Dep. at 247:8-23.) Plaintiff was informed that the shortage of work arose because Ms. Jones was "swamped with things that she had to get done by a deadline." (McZeal Dep. at 252:18-19.) Nevertheless, Plaintiff received her full salary and benefits during this time. (Id. at 251:16-18.)

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth

specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

B. Plaintiff's Retaliation Claims

Both "Title VII and the PHRA protect employees from discrimination by their employers on the basis of race, color, religion, sex or national origin." Fusco v. Bucks Cnty., No. 08-2082, 2009 WL 4911938, at *6 (E.D. Pa. Dec. 18, 2009) (Robreno, J.). Where, as here, the retaliation claims under both Title VII and the PHRA are based on indirect evidence, the framework set forth in McDonnell Douglas Corporation v. Green[4] governs. See Weston v. Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001). Under this test, the plaintiff bears the initial burden of showing "that (1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a 'causal link' exists between the adverse action and the protected activity."[5] Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). Upon making this showing, the burden shifts to the employer "to set forth a legitimate, nondiscriminatory reason for its action."

---

[4] 411 U.S. 792 (1973).

[5] "The same standards, decisional law, and analysis apply to retaliation claims under both Title VII and the PHRA." Fusco, 2009 WL 4911938, at *11 n.8 (citing Slagle v. Cnty. of Clarion, 435 F.3d 262, 265 n.5 (3d Cir. 2006)).

8

Seeney v. Elwyn, Inc., No. 08-5032, 2010 WL 1657185, at *3 (E.D. Pa. Apr. 22, 2010) (Robreno, J.). If the employer does so, the burden shifts back to the plaintiff to show that the proffered explanation is pretextual. See id.

Defendant argues that each of Plaintiff's eight retaliation claims fail as a matter of law, largely because Plaintiff cannot show a causal link between an adverse action and protected activity. Defendant further argues that Plaintiff has adduced no evidence from which a reasonable jury could find Defendant's nondiscriminatory explanations to be pretextual. Plaintiff, devoting all of three sentences in applying the governing law to the discovery record, opposes Defendant's motion, citing "an on going [sic] antagonism between the plaintiff and the defendant." (Pl.'s Resp. In Opp. at 10.)

1. Counts One and Six

Defendant argues it is entitled to summary judgment on Counts One and Six because Plaintiff cannot overcome Defendant's showing that the red-circle on Plaintiff's salary was nondiscriminatory.[6] The Court agrees. While Plaintiff's

---

[6] Defendant also argues that Plaintiff's claim is barred because she filed a charge of discrimination on March 17, 2008 after learning of the red-circle on April 1, 2007. Defendant's contention presumes, however, that each red-circled paycheck Plaintiff received falls outside the ambit of the Lilly Ledbetter Fair Pay Act of 2009 (the "FPA"), see 42 U.S.C. § 2000e-5(e)(3)(A), which rendered "each paycheck" stemming "from a

9

transfer to a new position after she engaged in protected employment activity resulted in her salary being red-circled, the transfer was part of an agreement between the parties. Indeed, Plaintiff agreed with Defendant to be transferred to the new position while represented by counsel. As Plaintiff acknowledges, this agreement automatically led to the red-circle on her pay. (See Am. Compl. ¶ 12.) The January 13, 2006 e-mail Defendant sent Plaintiff's counsel confirmed as much, explaining that Plaintiff's salary would be "'red-circled' . . . until the ordinary salary for the position reaches her salary via raises and other adjustments." (Def.'s Exs., Dixon Dep. Ex. 3.) Plaintiff has adduced no evidence that she responded to this e-mail or otherwise took issue with its representations. Under these circumstances, it is questionable whether Plaintiff can establish an adverse employment action at all. See Andreoli, 482 F.3d at 649.

At a minimum, however, this series of events provides a cognizable nondiscriminatory explanation for Defendant's

---

discriminatory compensation decision or pay structure . . . a tainted, independent employment-action that commences the administrative statute of limitations," Noel v. Boeing Co., 622 F.3d 266, 271 (3d Cir. 2010). While some courts have suggested that retaliation claims are not covered by the FPA, see Johnson v. District of Columbia, 632 F. Supp. 2d 20, 23 (D.D.C. 2009), the FPA's applicability to Plaintiff is at least debatable. However, because it is clear that Plaintiff's red-circling retaliation claims fail on the merits, the Court will not delve into this issue or address Defendant's statute of limitations argument.

10

action—namely, that Defendant believed Plaintiff agreed to have her salary red-circled as part of the settlement. See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) ("The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision. The employer need not prove that the tendered reason actually motivated its behavior . . . ." (internal citation omitted)). The burden, therefore, shifts to Plaintiff to demonstrate that Defendant's explanation is a pretext for retaliation. See Seeney, 2010 WL 1657185, at *3. Plaintiff has failed to meet this burden. This is particularly true given that Defendant promptly took remedial actions upon learning Plaintiff did not actually assent to the red-circle on her pay. Indeed, though the pay system still reads Plaintiff (and many other employees) as red-circled, Plaintiff is compensated as if she is not red-circled.

Because Plaintiff has put forth no evidence from which a reasonable jury could find Defendant's explanation to be pretextual, Defendant's motion for summary judgment will be granted as to Counts One and Six.

### 2. Counts Two, Three, Seven, and Eight

Defendant argues summary judgment should be granted as

to Counts Two, Three, Seven, and Eight because Plaintiff cannot (1) show a causal link between the failure to compensate her for overtime or promote her and her September 2005 harassment claim; or (2) overcome Defendant's proffered nondiscriminatory explanations. Defendant is correct on both grounds.

First, there is no evidence from which a jury can reasonably find a "'causal link' . . . between the adverse action and the protected activity," Andreoli, 482 F.3d at 649, because the decisions to not pay Plaintiff the thirteen hours of overtime or promote her to a nonexistent position occurred roughly two years after Plaintiff's sexual harassment claim and were not accompanied by any other evidence suggestive of causation, see Petril v. Cheyney Univ. of Pa., No. 10-6777, 2011 WL 1627928, at *6 (E.D. Pa. Apr. 29, 2011) ("To show causation, a plaintiff 'usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" (quoting Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007))); Coleman v. Textron, Inc., No. 02-8881, 2005 WL 713346, at *5 (E.D. Pa. Mar. 28, 2005) ("[T]he year and a half delay between the protected activity and the bumping cuts against the establishment of a causal link . . . .").

The evidence concerning the individuals responsible for

the decisions in question supports this conclusion. Indeed, while Ms. Jones was aware of Plaintiff's protected activity, she also welcomed Plaintiff into the Office of Student Placement and complimented Plaintiff's work to others. (See, e.g., McZeal Dep. at 103:18-19, 263:11-18.) And there is no evidence that Lee, who was responsible for Plaintiff's "lack of promotion," was aware of Plaintiff's sexual harassment claim at all. Instead, as his affidavit reflects, he first learned of it when Plaintiff filed this lawsuit. (See Def.'s Exs., SDP SJM Ex.)

Second, Plaintiff has adduced no evidence to overcome Defendant's nondiscriminatory explanation that (1) Plaintiff was actually paid for all the overtime hours she worked; and (2) the position Plaintiff attempted to create was not developed due to budgetary restrictions. As to the overtime, Plaintiff received other overtime payments during this period, and was informed by her supervisor that, her complaints notwithstanding, she had actually been "paid overtime for all the hours that [she] worked." (Def.'s Exs., SDP 00043.) Plaintiff has not so much as suggested that this nondiscriminatory explanation for failing to pay Plaintiff for the thirteen hours of overtime is a pretext for illegal retaliation. The same is true with respect to Defendant's explanation of its failure to promote Plaintiff; there is no evidence from which a reasonable jury could conclude that the budgetary considerations cited by Defendant are

13

pretextual.

Thus, Defendant's motion for summary judgment will be granted as to Counts Two, Three, Seven, and Eight.

### 3. Count Four

Count Four alleges that Defendant retaliated against Plaintiff by requiring security to let her into the building to complete overtime during after-business hours in November 2009 and December 2009. While Plaintiff's complaint does not clearly state whether this action was a retaliatory response to Plaintiff's 2005 sexual harassment claim or Plaintiff's filing of this lawsuit, Plaintiff's claim fails either way because Plaintiff cannot establish that this incident was an adverse employment action. See Andreoli, 482 F.3d at 649. Indeed, while Plaintiff's keycard did not permit 24/7 access to the building, security was directed to let her in to complete approved overtime. (McZeal Dep. at 243:3-18, 245:15-23.) Moreover, Plaintiff was not the only employee subjected to this policy, and successfully completed all approved overtime hours. (See id.; Def.'s Exs., SDP 00180.)

Under these circumstances, Plaintiff cannot show that "a reasonable employee" would have found Defendant's actions to be "materially adverse" because they would not "'dissuade[] a reasonable worker from making or supporting a charge of

discrimination.'" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). At best, Plaintiff suffered a de minimis inconvenience to which similarly situated employees were also subjected. She was in no way deprived of work opportunities, or otherwise harmed by Defendant's decision.

Because no reasonable jury could find the denial of 24/7 keycard access to be an adverse employment action, Defendant's motion for summary judgment will be granted as to Count Four.

### 4. Count Five

Finally, Defendant asks the Court to enter summary judgment in its favor on Count Five, which pleads that Defendant retaliated against Plaintiff by depriving her of work. Like Count Four, this claim does not make clear whether the alleged retaliation stemmed from Plaintiff's sexual harassment claim or this lawsuit. Either way, however, Plaintiff bears the burden of demonstrating a causal link between the protected activity and the retaliation. See Andreoli, 482 F.3d at 649. Plaintiff cannot do so. As noted, the sexual harassment claim was made in 2005. This lawsuit was filed June 2009 with a charge of discrimination being made in March 2008. Applying the latest of these three dates, nearly a year had elapsed between Plaintiff's

15

protected activity and the allegedly retaliatory conduct.  This
militates against a causal link, see Coleman, 2005 WL 713346, at
*5, and the record does not support Plaintiff's conclusory
reference to "an on going [sic] antagonism," (Pl.'s Resp. In Opp.
at 10.)  Moreover, Plaintiff offers no evidence from which a
reasonable jury could find pretextual Defendant's
nondiscriminatory explanation that the shortage in work stemmed
from her supervisor being "swamped" and facing an impending
deadline.  (McZeal Dep. at 252:13-19.)

Thus, Defendant's motion for summary judgment will be
granted as to Count Five.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for
summary judgment will be granted.  An appropriate Order will
follow.